Receipt number AUSFCC-11222384

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

HEALTHNBEAUTY.LIFE INC.,
an Illinois corporation,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 26-601 C

**COMPLAINT**

Plaintiff Healthnbeauty.life Inc., an Illinois corporation ("Plaintiff" or "HNBL") brings this action for damages against the United States of America based on the Department of Health and Human Services' ("HHS") and the United States Health Resources and Services Administration's ("HRSA") (collectively the "Agency") unjust and legally unsupported refusal to reimburse HNBL for claims covering emergency testing services rendered to the uninsured and timely submitted to the COVID-19 Uninsured Program ("UIP"). The Agency "held" the obligated payments due and owing to HNBL for COVID-19 testing services furnished to America's most impoverished and vulnerable populations during the COVID-19 Pandemic (the "Pandemic"). Significantly, the Agency has failed to honor its payment obligations to HNBL resulting in statutory, regulatory and contractual violations that caused significant damages to HNBL, amounting to well over $8.8 million.

## I. INTRODUCTION

1. In 2020, the World faced the unprecedented Pandemic. The new cases and deaths attributed to COVID-19 multiplied rapidly reaching more than 100

million reported cases and more than 2.5 million deaths a year later. COVID-19 became the third leading cause of death in the United States in 2020 and 2021.

2. The United States Centers for Disease Control and Prevention ("CDC") and National Institute for Health ("NIH") made it clear that all of our Nation's citizens could assist in reducing the spread of COVID-19 by, among other public health efforts, wearing masks, washing/sanitizing hands, maintaining physical distance and isolating when exposed to COVID-19. These actions alone, however, were not enough to stop the COVID-19 spread – testing was identified as critical and necessary to identify those exposed (often without symptoms) so they could isolate and reduce the spread and in order to provide earlier treatment that could reduce the risk of severe illness and death.

3. In 2020, the NIH posted an article emphasizing that efforts to develop COVID-19 testing and make that testing available on a nationwide basis would help prevent the spread of COVID-19 and save lives. (NIH Leadership "*Why COVID-19 Testing is the Key to Getting Back to Normal*" (September 4, 2020).) The NIH emphasized low-income racial and ethnic minorities and other vulnerable populations were disproportionately impacted by the Pandemic and had the highest rates of infection, most complications, and bad outcomes. In order to effectively implement the testing strategy, the federal government established programs that would remove the significant financial barriers to testing faced by the Nation's most vulnerable populations.

4. During the Pandemic, our Nation's health care providers and first responders put their lives on the line to develop COVID-19 testing and vaccines, to administer those tests and vaccines and to treat those infected with COVID-19. In the face of shutdowns, social distancing and quarantines, laboratory collection and testing personnel worked diligently to help stop the spread of this deadly virus despite their continuing exposure to COVID-19.

5. Indeed, at the height of the Pandemic, government officials called upon laboratories to step-up their coronavirus testing efforts to increase capacity and ensure that every American would have access to testing. By doing so, the federal government received a direct benefit because it was able to rely on existing provider infrastructures to implement the COVID-19 testing promises it made to the public.

6. Against the accelerating national COVID-19 crisis, the federal government established and funded the HRSA COVID-19 UIP. The Agency represented that the HRSA COVID-19 UIP would reimburse providers (who elected to participate in it) for providing COVID-19 testing, treatment and vaccine administration.

7. On March 18, 2020, Congress passed the Families First Coronavirus Response Act ("FFCRA"), which included appropriations to the Public Health and Social Services Emergency Fund to reimburse providers for COVID-19 testing providing to the uninsured. Pub. L. 116-127, 134 Stat. 178 (2020).

8. On March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") which appropriated further funds to the Public Health and Social Services Emergency Fund to be used for "health care related expenses or lost revenues that are attributable to coronavirus." Pub. L. No. 116-136, 134 Stat. 281 (2020).

9. HHS created the Provider Relief Fund ("PRF") using funds from the FFCRA and CARES Act and these funds supported, in part, COVID-19 testing for the uninsured. Additional funding used for the COVID-19 UIP was appropriated in the Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, 134 Stat. 620 (2020) ("PPPHCEA") and the American Rescue Plan Act of 2021, Pub. L. 117-2, 135 Stat. 40 ("ARPA").

10. As part of the CARES Act, the FFCRA, the PPPHCEA and the ARPA (collectively "UIP Funding Laws"), the Secretary of HHS established the COVID-19 UIP to provide claims reimbursement to eligible health care providers for testing

uninsured individuals for COVID-19, treating uninsured individuals with a COVID-19 primary diagnosis, and for COVID-19 vaccine administration for the period commencing February 4, 2020.

11. "The CARES Act and subsequent statutes tasked the Secretary of HHS with 'reimburs[ing] through grants or other mechanisms, eligible health care providers for health care related expenses or lost revenues that are attributable to coronavirus.'"[1] CARES Act, 134 Stat. at 563; PPPHCEA, 134 STAT at 622-623.

12. "At the time the Congress enacted these laws, the American healthcare system as a whole was facing an existential crisis. The paramount goal for the Agency was to get funds to providers nationwide as quickly and efficiently as possible. Accordingly, the CARES Act and subsequent statutes required [HHS and HRSA] to make payments 'in consideration of the most efficient payment systems practicable to provide emergency payment.'"[2] CARES Act, 134 Stat. at 563; PPPHCEA, 134 Stat. at 622-623.

13. HNBL is a CLIA-certified laboratory that provided COVID-19 testing services during the Pandemic to individuals covered by the HRSA COVID-19 UIP. Notwithstanding HNBL's timely and documented emergency testing services, the Agency has continued to withhold at least $8.8 million in UIP obligated payments due and owing to HNBL without providing any notice or opportunity to dispute such actions.

14. In or about November of 2021, HNBL registered with the COVID-19 UIP to receive payments for the provision of COVID-19 testing services to the uninsured. HNBL entered into a contract with HRSA entitled "Terms and Conditions for Participation in the HRSA COVID-19 Claims Reimbursement to Health Care

---

[1] Declaration of Alexandra Huttinger, Deputy Associate Administrator, Provider Relief Bureau, HRSA, HHS dated 9/6/23 and submitted in support of the Agency's Response to the Application for Preliminary Injunction in *Sana Healthcare Carrollton, LLC etc. v. Department of Health and Human Services et al*, Case No. CA 4:23-CV-738 (E.D. Tex.), paragraph 14.
[2] *Id.*

Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program" (referred to herein as the "Contract" or "UIP Terms and Conditions"). As part of the Contract, HNBL was required to, among other things, certify that (i) to the best of its knowledge, the patient had no health care insurance coverage; (ii) it would accept the COVID-19 Uninsured Program reimbursement as payment in full; and (iii) it would not balance bill the patient.

15. HRSA's contractors acknowledged acceptance of HNBL's COVID-19 UIP testing claims covering dates of service and submission between November 2021 and March 2022 (the "Claims").

16. The Fiscal Responsibility Act of 2023, Pub. L. No. 118-5 (June 3, 2023) ("FRA"), was enacted. The FRA rescinded certain unobligated appropriations made available under various laws, including UIP Funding Laws. (See FRA, Division B-Save Taxpayer Dollars, Title 1-Rescission of Unobligated Funds). HNBL is informed and believes that HRSA's contractors processed the claims through the adjudication process but were instructed by HRSA to withhold the payments due to HNBL well before the FRA was enacted. While HRSA continued to process and pay UIP testing claims up to approximately June 3, 2023, it failed to release at least $8.8 million in UIP obligated payments due and owing to HNBL for its Claims.

## II. JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of this action and venue is proper in this Court pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) ("Tucker Act") because HNBL brings claims for damages over $10,000 against the United States based upon the United States' violations of money-mandating statutes and regulations or alternatively, statutes and regulations that mandate payments be made by implication.

18. The Tucker Act is also the jurisdictional basis for HNBL's claims based on the Agency's breach of express contract or, in the alternative, implied-in-fact

contract and the implied covenant of good faith and fair dealing, all of which impose obligations that mandate the Agency pay HNBL for the unpaid Claims.

19. HHS was responsible for the COVID-19 UIP program oversight and HRSA, within HHS, was selected to administer the COVID-19 UIP. The federal government repeatedly acknowledged that the contract with providers who furnished testing services was authorized and controlled by the Secretary of HHS (Xavier Beccerra) such that he had actual authority to bind the United States. Throughout the contract period, the federal government repeatedly indicated that the Secretary of HHS would provide claims reimbursement and reimburse providers for COVID-19 testing.

20. Adjudication and approval of HNBL's COVID-19 UIP testing services, including determination of the quantifiable amount due to HNBL, constituted HRSA's agreement and legal liability to pay pursuant to 31 U.S.C. § 1501(a). Since no further Congressional action was needed to establish a right to payment, the obligation to remit these payments to HNBL occurred by operation of law, regardless of budgetary resources or appropriations.

21. While Congress enacted the FRA on June 3, 2023, the FRA's rescission of unobligated UIP funds has no bearing on the adjudicated payments due and owing to HNBL which are obligated, not unobligated, funds.

22. The controversy is ripe because the Agency has failed and refused to release the "held" payments that were obligated to be paid to HNBL for COVID-19 testing services rendered to HRSA COVID-19 UIP patients.

23. The actions and decisions of HHS and HRSA at issue in this action were conducted on behalf of the United States of America in the District of Columbia.

## III. PARTIES

24. Plaintiff, HNBL is and was, at times relevant hereto, a corporation, organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

25. The United States of America is the defendant in this action. HHS is a department of the United States government and oversees the activities of HRSA. HRSA is an operating division of HHS and the organizational component within HHS charged with the administration of the COVID-19UIP. HRSA's Provider Relief Bureau ("PRB") administered the claims reimbursement to health care providers that furnished emergency testing services.

## IV. FACTUAL ALLEGATIONS

### A. <u>HNBL's Participation in HRSA's COVID-19 Uninsured Program</u>.

26. The State of Illinois faced a COVID case upsurge at the end of 2021 with the State averaging 10,000 COVID cases per day. This was the first time Illinois had reached that threshold since November of 2020. During this time, Illinois also faced a massive increase in COVID related hospitalizations and an increase in positivity rates. At this point, it was imperative that individuals be tested for COVID-19.

27. In 2021, HNBL stepped-up to provide vital COVID-19 testing services. In response to the federal government's plea to providers to furnish expedited COVID-19 testing to the uninsured and its offer to reimburse providers for such services, HNBL made substantial monetary investments to establish a high complexity laboratory including the purchase of PCR testing systems. The new PCR testing systems with high automation allowed HNBL to significantly increase its testing capacity and ultimately provide support to the federal government's effort to return communities to work and school. In addition, HNBL engaged lab technicians to work 24/7 to furnish the COVID-19 testing services.

28. HNBL's COVID-19 testing services included specimen collection, diagnostic and antibody testing and testing-related visits in certain provider settings. HNBL entered into contracts with approximately 30 companies for sample collection resulting in over $2 million in amounts owed.

29. During this time, HNBL had approximately 20 contracted workers who dedicated hundreds of thousands of hours to the COVID-19 Uninsured Program testing process during the height of the Pandemic.

30. HNBL participated in the COVID-19 UIP from November, 2021, through March 22, 2022.

**B. <u>HRSA's Retention of HNBL's COVID-19 UIP Obligated Payments</u>.**

31. UnitedHealth Group ("UnitedHealth") was designated as the COVID-19 UIP administrator responsible for processing claims. Provider payments were facilitated through Optum Pay ACH ("Optum").

32. Following implementation of the HRSA COVID-19 UIP, HRSA and UnitedHealth presented a provider and facility-focused training webinar entitled "HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration of the Uninsured," ("UIP Process Training") representing, *inter alia*, that the program would provide claims reimbursement for eligible COVID-19 testing rendered to the uninsured on and after February 4, 2020. The UIP Process Training expressly stated "Your role is critical. Ensure you are reimbursed" and provided instructions and requirements related to claims submission, adjudication and payment process, indicating that eligible claims for reimbursement would typically be processed and paid within 30 business days.[3]

---

[3] *HRSA COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration of the Uninsured*, https://public3.pagefreezer.com/content/1719008671653/health-resources-and-services-administration/11-12-2023T14:31/https://www.hrsa.gov/sites/default/files/hrsa/provider-relief/covid-uninsured-program-webinar.pdf (last accessed archived content on June 27, 2024).

Moreover, HRSA expressly promised that HHS would provide claims reimbursement to health care providers for testing uninsured individuals for COVID-19.

33. HNBL submitted claims for reimbursement of COVID-19 testing services to HRSA's contractor, UnitedHealth. UnitedHealth issued temporary patient IDs for HNBL's billed claims. HNBL complied with the Contract terms and conditions including, without limitation, seeking patient attestations of their insured or uninsured status on Patient Intake Forms. Further, HNBL did not bill the UIP when a patient indicated they had insurance whether or not they identified the name of the third-party insurance company (or other insurance information).

34. HNBL is informed and believes that the Agency's contractors, UnitedHealth/Optum failed to make payments to HNBL for services already rendered, approved and billed at the direction of HRSA and/or HHS. HNBL submitted these claims between November of 2021 and March 22, 2022 and they constitute at least $8.8 million in UIP obligated payments.

35. On or about March 16, 2022, HRSA announced that the COVID-19 UIP would stop accepting claims related to testing and treatment at 11:59 p.m. on March 22, 2022 ("Claims Cut-Off Date") and for vaccines on April 5, 2022, alleging it had exhausted its funding. HNBL is informed and believes, and on that basis alleges, that HRSA had not in fact exhausted all available UIP funding as of the Claims Cut-Off Date, as evidenced by the Agency's subsequent continuation of claims adjudication and payment to other providers following the Claims Cut-Off Date.

36. Following the Claims Cut-Off Date, HNBL's billing company continued to communicate with the Agency and its contractors to determine when its claims would be reimbursed. In April of 2022, UnitedHealth represented that HRSA was aggressively working on payments, that HNBL's claims were sent to "escalated payment," that it would take five to seven business days [to pay the

claims] and UnitedHealth would provide an update to HNBL as to when payments would be deposited in its bank account. In August 2022, HNBL still had not received payments but was informed by UnitedHealth that HRSA had started paying the lab claims and payment would be made within 30 business days.

37. HHS, Office of Inspector General ("OIG") expressly stated in its July 2023 HRSA audit report that, "[e]ven though HRSA was no longer accepting UIP claims, HRSA's contractor was continuing to adjudicate and pay claims that were submitted before the program submission deadlines."[4]

38. Notwithstanding the OIG's statement that HRSA was adjudicating and paying claims submitted before the Claims Cut-Off Date and the Agency's continuing representations to HNBL that its claims were processed and payments would be made, the Agency never reimbursed HNBL for any of its claims.

39. The Agency's actions resulted in the Agency's retention of the UIP Obligated Payments which are due and owing to HNBL for COVID-19 Uninsured Program testing services already completed, submitted prior to the HRSA COVID-19 Uninsured Program Claims Cut-Off Date, and, on information and belief, approved for payment by UnitedHealth.

### C. HRSA's COVID-19 UIP Assessment Used to Hold Obligated Payments.

40. While HRSA notified HNBL on March 25, 2022 that it would be contacted for documents to assess compliance with the Contract and payments would be paused at that time, HNBL was not notified of the Assessment until September of 2022. In a letter dated September 13, 2022, Stephanie Sowalsky, CPA, Program Integrity Branch Chief of the Provider Relief Bureau with HRSA notified

---

[4] *HRSA Made COVID-19 Uninsured Program Payments to Provider on Behalf of Individuals Who Had Health Insurance and for Services Unrelated to COVID-19*, (A-02-21-01013) (July 2023), fn. 10., https://oig.hhs.gov/documents/audit/6536/A-02-21-01013-Complete%20Report.pdf (last accessed on June 27, 2024).

HNBL that HRSA was going to conduct a pending claims Assessment to determine if HNBL's submissions were in compliance with the Contract and other legal requirements (the "Assessment"). HRSA engaged CSCI Consulting ("CSCI") to conduct the Assessment. HNBL submitted the requested Assessment documents by October 19, 2022.

41. HNBL was notified that CSCI completed the Assessment as of November 29, 2022 and had sent the findings to HRSA for review. On multiple occasions thereafter, HRSA represented that it was continuing the Assessment review but it never indicated to HNBL that it did not intend to release payments for the submitted claims until enactment of the FRA.

42. In the September 13, 2022 Assessment letter, HRSA represented to HNBL that, "after the pending claims assessment is completed, any claims that your organization successfully submitted prior to [April 6, 2022] and were placed on hold may be paid subject to the availability of funding."

43. While HRSA had the Assessment findings more than six (6) months prior to the FRA, it never provided the Assessment findings to HNBL. HRSA also never communicated to HNBL that it's UIP claims would not be paid based on the FRA until October 2023 when it first sent a letter to HNBL stating HNBL would not be paid due to the FRA. Despite HNBL's numerous communications to HRSA seeking UIP claims payment status after the alleged Assessment was completed by CSCI in November of 2022, HRSA never responded. HRSA also failed to respond to multiple bipartisan congressional inquiries made on behalf of HNBL, spanning the period May 2022 through November 2024, regarding HRSA's obligation to pay the UIP claims – claims that HNBL alleges constitute obligated funds, notwithstanding HRSA's classification of them as unobligated funds subject to the FRA rescission.

44. HNBL is informed and believes that HRSA intentionally delayed reviewing and/or providing the Assessment findings in order to assert that, based on the FRA, there were no unobligated funds available to pay the Claims.

## CLAIMS FOR RELIEF

### COUNT ONE

### (Breach of Express Contract)

45. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

46. The federal government committed to the provision of COVID-19 testing services in response to the Pandemic and offered providers the opportunity to immediately fulfill that commitment. In return, the federal government promised providers that it would expedite reimbursement for those services and enacted the UIP Funding Laws expressly for the purpose of reimbursing providers.

47. The federal government established intent to contract through the UIP Terms and Conditions as well as many other documents and statements which induced providers to step-up and expand testing during the Pandemic and affirmed the federal government's promise to timely pay providers' testing claims. HNBL demonstrated intent to contract by investing in the development of a high complexity lab and agreeing to the UIP Terms and Conditions.

48. The federal government received a direct benefit in that it was able to respond to a national emergency by ensuring that uninsured individuals were receiving vital health care services to prevent the spread of COVID-19 as the federal government was unable to provide such services at such a scale without fortifying the existing healthcare system through the assistance of private companies. The federal government was also able to fulfill its statutory mandate under the CARES Act and FFCRA to ensure widespread testing to reduce community spread.

49. HNBL's performance of the expedited testing and compliance with HRSA's requirements together with the federal government's promised reimbursement, established mutual benefit and consideration.

50. The Contract explicitly identified the Secretary of HHS as the government representative who bound the government to reimburse providers. The Contract provided that "[t]he Secretary will reimburse the Recipient generally at 100 percent of Medicare rates" (unless there was no Medicare rate, in which case, a calculated average would be used)" for the COVID-19 testing services provided to uninsured individuals, creating a binding contractual obligation.

51. HRSA published "FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration" (the "UIP FAQs") addressing the details of the HRSA UIP. The FAQs stated: "[t]he Administration is providing support to health care providers fighting the Pandemic through the COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment, and Vaccine Administration for the Uninsured Program (HRSA COVID-19 Uninsured Program). This program provides reimbursements on a rolling basis directly to eligible providers for claims attributed to the testing, treatment, or vaccine administration for COVID-19 for uninsured individuals." The FAQs also represented that the "majority of claims are reimbursed within 30 days."[5]

52. HRSA contracted with UnitedHealth and Optum to adjudicate and pay claims submitted by laboratories, including HNBL, for COVID-19 testing services rendered to UIP patients. UnitedHealth represented that claims would be processed

---

[5] *HRSA FAQs for COVID-19 Claims Reimbursement to Health Care Providers and Facilities for Testing, Treatment and Vaccine Administration* https://public3.pagefreezer.com/browse/health-resources-and-services-administration/11-12-2023T14:31/https:/www.hrsa.gov/provider-relief/about/covid-uninsured-claim/faq (last accessed archived content on June 27, 2024).

and paid within 30-45 calendar days of submission and HRSA confirmed in 2023 that most claims were reimbursed within 30 days of submission.

53. HRSA breached the Contract by failing and refusing to pay HNBL at least $8.8 million in UIP obligated payments due and owing to it for testing services rendered to the COVID-19 UIP.

54. Notably, HNBL made substantial monetary investments to purchase two PCR testing systems and secured lab space to meet the UIP testing demands. It was forced to lay off its workforce and was unable to pay its subcontractors. As a result of the Agency's material breach of the Contract including, its failure to timely pay HNBL the amounts due and owing to it, HNBL incurred additional consequential damages.

55. As a result of the Agency's material breach of the Contract, HNBL has been damaged in the amount of at least $8.8 million in UIP obligated payments, together with consequential damages it sustained as a result of the Agency's breach, plus interest, costs of suit and such other relief as this Court deems proper.

**COUNT TWO**

**(Breach of Implied-in-Fact Contract)**

56. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

57. In the alternative, HNBL entered into a valid implied-in-fact contract with the Agency regarding its obligation to reimburse HNBL for COVID-19 testing services furnished to the uninsured population.

58. During the Pandemic, the United States urgently sought the services of health care providers for testing, vaccines and treatment for the uninsured population in order to stop the spread of COVID-19, offering to reimburse them for such services at Medicare rates. HNBL responded to the Agency's offer, invested heavily in labor, equipment and technologies, including the purchase of PCR testing systems with high automation that allowed for significant increases in testing capacity, and

agreed to participate in the HRSA COVID-19 UIP by furnishing testing services to the uninsured.

59. The parties' agreement is confirmed by the parties' conduct and performance following HNBL's attestation to the terms and conditions for participation and registration in the online portal.

60. HNBL provided a real and substantial benefit to the Agency by agreeing to participate in the UIP and delivering timely COVID-19 testing services to the uninsured.

61. HNBL has satisfied and complied with its obligations and/or conditions under the implied-in-fact contract including, but not limited to, attestations that, to the best of its knowledge, the patients were uninsured and that it was not balance billing UIP patients.

62. Even assuming, arguendo, that HRSA contends the UIP ran out of funds and/or that UIP funds are no longer available due to the FRA's rescission of unobligated UIP funds in June of 2023, such contentions are without merit and do not abrogate the Agency's contractual obligations to remit at least $8.8 million to HNBL for testing services rendered and billed and claims accepted by the Agency prior to the UIP Claims Cut-Off Date.

63. HRSA breached the implied-in-fact contract by reversing and/or imposing a hold of Claims payments while it delayed the Assessment process, and by now failing and refusing to pay HNBL at least $8.8 million in obligated payments due and owing to it for UIP COVID-19 testing services.

64. As a result of the Agency's material breach of the implied-in-fact contract, HNBL has been damaged in the amount of at least $8.8 million, together with other losses it sustained as a result of the breach, plus interest, costs of suit and such other relief that this Court deems just and proper.

## COUNT THREE

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

65. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

66. The covenant of good faith and fair dealing is implied in every contract, express or implied, including contracts with the federal government. The covenant imposes obligations on the parties including, the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party to receive the "fruits of the contract."

67. The Contract created the reasonable expectation that HNBL would diligently and timely furnish COVID-19 testing services to the UIP and that the Agency would timely reimburse HNBL for rendering such testing services.

68. HNBL performed its obligations under the Contract by furnishing timely COVID-19 testing services to the uninsured. Moreover, HNBL and its laboratory collection and testing personnel diligently furnished these testing services to help stop the spread of this deadly virus despite their continuing exposure to COVID-19.

69. The Agency, however, unfairly prevented HNBL from receiving its benefits under the Contract.

70. The Agency failed to honor its contractual obligations and acted in a way that was designed to injure or destroy HNBL's rights to receive the benefits under the Contract *i.e.,* at least $8.8 million in payments due for testing services furnished and claims submitted before the March 2022 UIP Claims Cut-Off Date and well before enactment of the FRA. The Agency acted in bad faith in violation of the covenant by failing to timely remit payment for valid UIP claims without a contractual or legal basis to do so.

71. The Agency breached the implied covenant of good faith and fair dealing by taking several arbitrary and unreasonable actions including, but not limited to:

(a) intentionally delaying the Assessment to avoid paying HNBL for COVID-19 UIP testing services rendered, and claims submitted, before the UIP Claims Cut-off Date;

(b) implementing a legally unsupported "hold" on at least $8.8 million in UIP obligated payments due and owing to HNBL for COVID-19 UIP testing services while it conducted the Assessment and delayed the Assessment findings; and

(c) improperly relying on the FRA's June 2023 rescission of unobligated UIP funds to now support payment denial of at least $8.8 million in obligated payments.

As a direct and proximate result of the above breaches of the covenant of good faith and fair dealing, HNBL has been damaged in the amount of at least $8.8 million.

**COUNT FOUR**

**(Violation of Money Mandating Statutes and Regulations to Reimburse Providers for COVID-19 UIP Testing Services)**

72. Plaintiff realleges and incorporates by reference all of the allegations contained in the preceding paragraphs as if fully set forth herein.

73. The Agency was mandated to reimburse HNBL, an eligible UIP health care provider, for allowable testing services.

74. As part of its obligations under the UIP Funding Laws, the Agency was required to pay HNBL for emergency testing services rendered and, for which claims were submitted, prior to the UIP Claims Cut-Off Date.

75. Alternatively, the Agency created a regulatory framework whereby the UIP Funding Laws, the Terms and Conditions, UIP Process Training, UIP FAQs and

guidelines and website together with HNBL's satisfaction of the UIP statutory and regulatory requirements mandate the Agency to reimburse HNBL's claims.

76. As of the filing of this action, the Agency has failed, without justification, to pay HNBL at least $8.8 million in UIP obligated payments due and owing to it for COVID-19 UIP testing services. The Agency's intentional delay and failure to timely pay HNBL for testing services rendered prior to the UIP Claims Cut-Off Date is a violation of the UIP Funding Laws and Agency regulations that mandate reimbursement of the claims due and owing to HNBL. HNBL has been significantly harmed by the Agency's failure to comply with the statutory and regulatory requirements.

77. HNBL has the right to recover damages based on the Agency's violation of statutory and regulatory requirements mandating payment of the Claims, whether express or by implication, and HNBL's satisfaction of those requirements.

**PRAYER FOR RELIEF**

WHEREFORE, HNBL respectfully requests this Court to enter judgment in its favor and against Defendant and:

1. Award damages sustained by HNBL, in the amount of at least $8.8 million, together with any losses sustained as a result of Defendant's breach;

2. Award HNBL such additional damages and other monetary relief as is available under applicable law;

3. To the extent available, award HNBL pre-judgment and post-judgment interest;

4. To the extent available, award available attorneys' fees and costs to HNBL; and

5. Award such other and further relief to HNBL as the Court deems just and proper.

DATED: April 23, 2026

Respectfully submitted,

*/s/ Elaine F. Harwell*

Elaine F. Harwell
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398
Email: elaine.harwell@procopio.com
Counsel for Plaintiff

OF COUNSEL:
Diane M. Racicot
Procopio, Cory, Hargreaves & Savitch LLP
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398
Email: diane.racicot@procopio.com